CARENOUGH (THOMPSON v.). See Case No. 13,947.

---

## Case No. 2,397.

CAREW et al. v. BOSTON ELASTIC FABRIC CO.

[3 Cliff. 356; 5 Fish. Pat. Cas. 90; 1 O. G. 91; Merw. Pat. Inv. 111.][1]

Circuit Court, D. Massachusetts. May Term, 1871.

PATENTS — PROCESS FOR REWORKING VULCANIZED RUBBER—REISSUE TO EXECUTOR—SPECIFICATION —AMENDMENT—CONSTRUCTION — INFRINGEMENT —PRACTICE—DAMAGES—INCREASE BY COURT.

1. Where an original patentee has deceased and his estate is under administration, his executor or administrator may make a surrender and obtain a reissue.

[See Smith v. Mercer, Case No. 13,078.]

2. The commissioner may allow the original specification to be amended in the reissue, and he may permit the applicant for a reissue to redescribe his invention, including in the new description and claims not only what was well described before, but also what was suggested

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission. Merw. Pat. Inv. 111, contains only a partial report.]

or indicated in the original specification, drawings, or patent-office model.

[Cited in Whitcomb v. Coal Co., 47 Fed. 659.]

[See Tucker v. Tucker Manuf'g Co., Case No. 14,227; Draper v. Potomska Mills Corp., Id. 4,072; Woven-Wire Mattress Co. v. Wire-Web Bed Co., 8 Fed. 87; Telegraph Co. v. Wiley, 17 Fed. 234.]

3. New features, ingredients, or devices, neither described, suggested, or indicated in the original specification or model, cannot be embodied in the new description.

[See note at end of case.]

[See Sarven v. Hall, Case No. 12,369.]

4. An inventor described his improvement in his original patent as a process for working over vulcanized rubber and moulding it into any desired shape; and stated that in carrying the process into effect many foreign articles of less cost than rubber could be incorporated so as to produce a substance having all the valuable properties of vulcanized rubber at such reduced cost as to admit of its being applied to many more useful purposes. The description in a reissue stated that the principal features of the process consisted in applying heat by means of steam to rubber mixed with substances commonly used in vulcanizing rubber, or to rubber compound which has once been vulcanized either with or without the addition of fresh rubber, the same, whether the rubber or the compound, is or not pressed into moulds or dies of the desired form, and the steam introduced into steam-chambers or steam-jackets, and thereby conducted around the moulds or dies which come in contact with the compound to be moulded into the desired form. The corresponding passage in the original specification was in effect that the principal features of the new process consisted in applying heat either to rubber in its native state, or to rubber with the substances commonly used in vulcanizing rubber which has once been vulcanized by means of steam. The description further stated that the rubber compound while being heated was pressed into moulds or dies to give it the desired form. Also that the steam was conducted around all portions of the moulds or dies which come in contact with the rubber or compound to be moulded. Also, by this means the process of curing rubber was greatly facilitated, and vulcanized rubber which had before resisted all attempts to remould it was readily pressed into any desired shape. *Held*, that the substance of the two descriptions in these portions was the same, and that the original one sustained that of the reissue.

5. It is the duty of the court to collect the intention and meaning of the inventor from the whole specification, and, if practicable, to adopt such a construction as will render the patent available for the purpose for which it was granted.

[Cited in La Baw v. Hawkins, Case No. 7,960.]

6. The reissued patent did not embrace the invention of Charles Goodyear, which was for curing the native rubber when combined with or in the presence of sulphur by submitting the same to a high degree of artificial heat, and also for a manufacture called vulcanized India-rubber, being a compound of India-rubber with sulphur chemically altered by a high degree of heat, because that invention was disclaimed in the original specification, and it was stated to be the chief feature of the invention to cure again vulcanized rubber and mould it into any desired shape, and because the reissue also stated that the value of vulcanized rubber ceased when the article made out of it was worn out, and that foreign substances might be mixed with rubber compound so as to form a substance having the properties of vulcanized rubber, but composed of cheaper materials.

7. Where one paragraph in a reissue specification would seem to lead to a construction which would make void the reissue, explanation of its meaning may be sought in a succeeding one.

8. Where the process and purpose are plainly suggested and understood, and the language in an original specification is suggestive of new terms and names used in the reissue, such new names and terms do not show that the reissue is descriptive of an invention different from that set out in the original.

9. The correct practice is, where infringement to any extent is admitted, if the patent is held to be valid, to enter an interlocutory decree for complainant and send the cause to a master to ascertain the amount the complainant is entitled to recover.

10. Under the act of July 8, 1870 [16 Stat. 206], where a decree is entered for complainant, he may recover, in addition to the profits to be accounted for by the respondent, the damages he has sustained, and the court may in its discretion assess the same.

11. Profits are to be accounted for in such case by the respondent wherever the decretal order to that effect is entered, and if the injuries sustained by the complainant from the infringement are greater than the gains and profits realized by the respondent, then the complainant is entitled to recover compensation for the excess of the injuries beyond the amount estimated for profits of the respondent.

[Cited in Buerk v. Imhaeuser, Case No. 2,107.]

[See note to Case No. 2,142.]

12. Actual damages are assessed in the first instance, but the court may in its discretion increase the amount to a sum not exceeding three times the amount estimated and assessed as the actual damages sustained beyond the gains and profits realized by the respondent.

[Cited in Star Salt Castor Co. v. Crossman, Case No. 13,320.]

[See Stimpson v. The Railroads, Case No. 13,456; Allen v. Blunt, Id. 217; Kneass v. Schuylkill Bank, Id. 7,876; Schwarzel v. Holenshade, Id. 12,506.]

On the 29th of August, 1854, letters-patent [No. 11,608] were granted to Daniel Hayward, since deceased, for certain new and useful improvements in the manufacture and in the process of manufacturing vulcanized rubber, for the term of fourteen years, and on the 28th of August, 1868, the letters-patent were extended in the name of [Caleb Swan] the executor of the patentee for the further term of seven years from the expiration of the original term of the letters-patent. Subsequently to the extension of the patent, —to wit, on the 15th of December in the same year,—the executor of the original patentee, by deed of assignment in due form, conveyed all his right, title, and interest in the letters-patent to the first-named complainant, through whom, by virtue of certain agreements, the other complainants derived their titles. By virtue of that conveyance the legal title to the letters-patent became vested in the assignee, and the record showed that he, on the 6th of July, 1869, surrendered the letters-patent on account of a defective or insufficient specification, and that a new patent was issued to the same party, and,

as the complainant alleged, for the same invention. [Reissue No. 3,531.] They also allege that the original patentee was the original and first inventor of the improvement; that they, the complainants, were the owners of the reissued letters-patent, and of the exclusive right to make and use the invention, and vend the same to others to be used, and that they were entitled to be protected in the enjoyment of that exclusive right during the residue of the term for which the reissued letters-patent were granted. Acquiescence by the public in their claim, that the exclusive right to the improvement belonged to them, was also alleged, and that they would have derived large gains and profits from the manufacture of the patented product but for the wrongful doings of the respondents; and they charged that the respondents, ever since the reissued letters-patent were granted, had unlawfully and wrongfully made, used, and sold large quantities of articles composed of the patented product, and manufactured in the manner and by the process patented and secured in their letters-patent, and that they, the respondents, had received great gains and profits from the manufacture and sale of such articles, and from the unlawful use of their invention. Process was issued and duly served, and the respondents appeared and filed an answer. The defences urged were as follows: 1. That the executor of the original patentee was not authorized by law to surrender the original letters-patent and to obtain the reissued letters-patent described in the bill of complaint. 2. That the reissued letters-patent were not granted for the same invention as that described in the specification of the original letters-patent. 3. That the patentee in the original letters-patent was not the original and first inventor of the alleged improvement. 4. That the respondents have not infringed, except to a small extent, the patented invention as alleged in the bill of complaint.

[Defendant demurred to the bill, and the demurrer was overruled. See case No. 2,398, next following.]

Whiting & Russell and J. E. Maynadier, for complainants.

George Gifford and F. A. Brooks, for respondents.

CLIFFORD [Circuit Justice]. Authority to accept the surrender of an original patent in certain cases where the specification is defective or insufficient, and to grant a new patent to the inventor of the improvement, is conferred upon the commissioner of patents, and where he accepts the surrender and grants a new patent, his decision in the premises, in a suit for infringement, is final and conclusive, unless it is apparent upon the face or the reissued patent, as matter of legal construction, that it is not for the same invention as that secured in

the original letters-patent. 5 Stat. 122; 16 Stat. 206; Seymour v. Osborne, 11 Wall. [78 U. S.] 542.

Controversies of the kind where the original patentee has deceased, and where the reissued letters-patent were in the name of the executor or administrator, have often come before the courts, and the printed arguments for the respondents refer to no decided cases where it is held that the letters-patent are invalid on that account. Goodyear v. Providence Rubber Co. [Case No. 5,583]; 9 Wall. [76 U. S.] 788.

Specifications in letters-patent are frequently found to be defective or insufficient, and where the original patentee has deceased and his estate is under administration, it is difficult to see any solid objection to the power of his executor or administrator to make the surrender and obtain the reissue. Patents which are inoperative or invalid by reason of a defective or insufficient description or specification, if the error arose by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, may be surrendered, and the commissioner is authorized, upon the payment of thirty dollars, to cause a new patent to be issued to the inventor for the same invention for the residue of the period then unexpired, for which the original patent was granted, and the repealed patent act, under which the reissued letters-patent were granted in this case, provided that "in case of his death, or any assignment by him made of the original patent, a similar right shall vest in his executors, administrators, or assigns." 5 Stat. 122; 16 Stat. 106.

Reissued letters-patent must, by the express words of the section authorizing the same, be for the same invention, and consequently, where it appears on a comparison of the two instruments as matter of law that the reissued patent is not for the same invention as that secured in the original patent, the reissued patent is invalid, as the commissioner in that state of the case must be held to have exceeded his jurisdiction. Power is unquestionably conferred upon the commissioner to allow the specification to be amended, if the patent is inoperative or invalid, and in that event to issue a new patent in proper form, and he may doubtless under that authority allow the patentee to redescribe his invention, and to include in the description and claims of the patent, not only what was well described before, but whatever else was suggested or substantially indicated in the specification, drawings, or patent-office model, which properly belonged to the invention as actually made or perfected. Interpolations of new features, ingredients, or devices, which were neither described, suggested, nor indicated in the original patent or patent-office model, are not allowed, as it is clear that the commissioner has no jurisdiction to grant a reissue unless it be for the same invention as that

embodied in the original letters-patent. Seymour v. Osborne, 11 Wall. [78 U. S.] 544.

Apply those rules to the case at bar, and it is clear as anything in legal decision can be, that the second defence set up by the respondents cannot be sustained. Certain parts or passages of the specification of the reissued patent are incorporated into the answer of the respondents as showing that the reissued patent describes and claims an invention or certain features of an invention different from that described and secured in the original patent; but the court is of a different opinion, as everything described in the parts or passages of the original specification selected and embodied in the answer as supporting that defence is found either fully set forth or plainly suggested or substantially indicated by the inventor in the specification or drawings of the original patent. He describes his improvement in the original letters-patent, as a process for working over vulcanized rubber and moulding it into any desired shape; and he states that in carrying the process into effect, many foreign articles of less cost than rubber may be incorporated into the rubber so as to produce a substance or compound having all the valuable properties of vulcanized rubber, at such a reduced cost as to admit of its being more extensively used than heretofore, and to be applied to many new and useful purposes. The respondents select as the chief ground of complaint the following parts or passages contained in the specification of the reissued letters-patent. Pressure, says the patentee, in certain cases is necessarily applied in order to give homogeneousness to the material and to free it from blisters and other imperfections, and where rubber goods which were vulcanized by the ordinary process in ovens or steam-boilers, are blistered or imperfectly vulcanized, it is found that that the defects may be cured by placing the material between steam-jackets, and under pressure, and that the blisters and imperfections may be removed by the action of heat and pressure there applied.

Preceding that part of the specification embodied in the answer as the one describing a different invention from that secured in the original patent, the patentee states that in some cases the mere confinement of the compound between the surrounding steam jackets or chambers may be sufficient without the application of any actual pressure before the compound is vulcanized, inasmuch as the material always expands in bulk during the process of vulcanization, which produces a pressure upon the surfaces by which it is surrounded and confined. Vulcanized rubber, the patentee in the reissued letters-patent states, ceased to be of value when the article constructed from it had become worn out, as it is well known that it possesses properties which practically prevent its being used a second time, and he proceeds to represent that the improvement consists in a new process for vulcanizing and moulding any compound of rubber capable of being vulcanized, and that the improvement is applicable also to working over and revulcanizing rubber compound which has already been vulcanized and put to use. He also states that by the process many foreign substances may be intermixed with the ordinary rubber compound, whether already once vulcanized or newly compounded for vulcanization, so as to form a substance having the valuable properties of vulcanized rubber compound although composed in a great part of cheaper materials. Superadded to those representations is the further statement that the principal features of the process consist in applying heat by means of steam to rubber mixed with substances commonly used in vulcanizing rubber, or to rubber compound which has once been vulcanized, either with or without the addition of fresh rubber, the same, whether the rubber or the compound is or not pressed into moulds or dies of the desired form, and the steam introduced into steam-chambers or steam-jackets and thereby conducted around the moulds or dies which come in contact with the compound to be moulded into the desired form. Much reliance is placed upon that passage of the specification of the reissued patent as showing that the specification describes an invention different from that described in the specification of the original patent; but the court is clearly of the opinion that it fails to establish any such proposition within the meaning of the patent law. Some difference undoubtedly exists between the phraseology of that passage and the corresponding passage in the specification of the original patent; but the substance of the two descriptions is the same as clearly appears by comparing that passage with the language employed in the specification of the original patent, in which it is stated that the principal features of the new process consist in applying heat either to rubber in its native state, or to rubber with the substances commonly used in vulcanizing rubber which has once been vulcanized by means of steam. No attempt is made to show that the introductory representation of that passage differs in any essential particular from the corresponding representation in the specification of the reissued patent, but it is insisted that the succeeding portion of the paragraph falls short of sustaining the corresponding feature in the new patent. The court is unable to sustain that proposition, as the patentee states in effect, in continuing the description of his process, that the rubber or compound while thus heated, is pressed into moulds or dies which give it the desired form, "the steam being conducted around all portions of the moulds or dies which come in contact with the rubber or compound to be" moulded into the desired form. "By this means the process of curing rubber is greatly facilitated.

and vulcanized rubber, which has hitherto resisted all attempts to remould it, is readily pressed into any desired shape."

Other references to the respective specifications might be made to show that the reissued patent is for the same invention as that embodied in the original patent, but it is not necessary to pursue the subject, as it is quite evident that the new patent does not contain anything which is not fully described or substantially suggested in the specifications or drawings of the surrendered patent. Three varieties of apparatus are described as sufficient to illustrate the application of his improved process to the production of different articles manufactured of rubber and its compounds. He then remarks that the essential feature of the process is not the use of such a form of machine, or of moulds or dies, but that it consists in "so introducing steam to the moulds and dies as to cause it to circulate entirely through and around the same, or substantially so, so that substantially every part of the rubber or compound which bears against the moulds or dies shall come in contact with a surface heated by steam," softening the compound so that it may be moulded into the requisite shape or form by the pressure of the dies. Special reference is made to the fact that the words "uneven surfaces," "blisters," or "smoothing surfaces," or "plating articles" are not mentioned in the specifications of the original patent; but it is a sufficient answer to that suggestion to say that the term "moulding rubber" and its compounds may well include all that is meant by those particular phrases.

Want of novelty is the next defence, and in connection with the general allegation that the original patentee is not the original and first inventor of the improvement, the defence is presented in two or three special forms which will be noticed as a part of the same defence. Proofs were taken on both sides, and the complainants at the final hearing introduced in evidence the reissued letters-patent as described in the bill of complaint. Such evidence, that is, the letters-patent on which the suit is founded when introduced by the complainant, afford a prima facie presumption, if they are in due form, that the patentee is the original and first inventor of what is therein described as his improvement, and the complainants, when the true meaning of the claims of the letters-patent is ascertained, are entitled to the benefit of that presumption. Much difficulty is experienced in determining the true meaning of the specification and claims of the patent, as they contain many expressions tending to support the charge that the patentee of the reissued patent intended to embrace the invention of Charles Goodyear, which was for curing the native rubber when combined with or in the presence of sulphur, by submitting the same to the action of a high degree of artificial heat, and also for the new manufacture called vulcanized India-rubber, being a combination of India-rubber with sulphur chemically altered by the application of a high degree of heat. If so construed as to include that invention, the letters-patent would certainly be invalid, as that patent was of a prior origin, and its validity was sustained in this court, and affirmed in the supreme court. Goodyear v. Providence Rubber Co. [Case No. 5,583]; Id., 9 Wall. [76 U. S.] 795.

But the rule ut res magis valeat quam pereat is as applicable to patents as to any other instruments in regard to which it is the duty of the court to adopt a liberal construction in order to give effect to the intention of the parties. Ryan v. Goodwin [Case No. 12,186]; Evans v. Eaton, 3 Wheat. [16 U. S.] 512.

Where doubts arise, it is the duty of the court to collect the intention of the parties from the whole instrument, and, if practicable, to adopt such a construction as will give it effect and render it available for the purpose for which it was granted. Apply that rule to the construction of the letters-patent, and it is quite clear that the specifications and claims of the patent do not embrace what was invented by Charles Goodyear as described in his letters-patent. Express disclaimer of any such pretensions is contained in the original letters-patent, in which the patentee states that he does not claim the curing of India-rubber in its natural state when compounded with sulphur and lead by the use of heat or of steam, nor the compounding of sulphur, white-lead, or coal-tar with India-rubber, and he admits, in terms too explicit to be denied, that "all those have been the subjects of previous patents." Confirmation of that view is also derived from the statement of the patentee in the specification of the original patent, that the leading and most important feature of my improvements is the curing again and reproducing of vulcanized rubber from scraps or fragments which have once been vulcanized. Working over vulcanized rubber and moulding it into any desired shape is, in the opinion of the court, the main feature of the invention as described in the original patent, but it is certain that the patentee also states that many foreign articles may be so incorporated with the India-rubber or caoutchouc, either in its native state or when vulcanized, or otherwise prepared, as to produce a substance which has all the properties of vulcanized rubber. India rubber in the native state may unquestionably be used in a certain proportion as an ingredient of the compound, but the main feature of the invention is to prepare old vulcanized rubber, with or without foreign articles, for a second use by means of moulds or dies. Heat generated by steam is applied, whether the substance is rubber in the native state, or rubber with the substances commonly used in vulcanizing the same; but the patentee in the original patent proceeded to say that the rubber or compound, while thus heated, is pressed into moulds or dies, which give it the desired form, and that the steam

is conducted around all portions of the moulds or dies which come in contact with the rubber or compound.

Enough is also found in the specification of the reissued patent to lead to the same conclusion. Prior to the invention, as the patentee in the new patent states, the value of vulcanized rubber ceased when the article as manufactured was worn out, or had served the purpose for which it was prepared, as it could not be worked over or used a second time. Beyond doubt the next succeeding paragraph of the specification gives some support to the indefinite and unlimited construction assumed by the complainants; but it is clear, if that view is adopted, that the reissued patent would be void in having been granted for a different invention from that described in the original specification. Satisfactory explanation to the contrary, however, is found in the latter clause of the same paragraph, in which it is said that many foreign substances may be intermixed with the ordinary rubber compound, whether already once vulcanized or newly compounded for vulcanization; and the succeeding paragraph shows, even more conclusively, what the actual invention is, and that the patentee never pretended to embrace any of the improvements made by the great inventor in this department of the useful arts. Many foreign substances, he says, may be intermixed so as to form an article having the valuable properties of vulcanized rubber compound, although composed in a great part of cheaper materials; and he then proceeds to say, that the principal features of his process consist in applying heat, by means of steam, to rubber mixed with substances commonly used in vulcanizing rubber, or to rubber compound which has once been vulcanized, either with or without the addition of fresh rubber, the rubber or compound while thus heated being pressed into moulds or dies of the desired form, and the steam being introduced into steam chambers or jackets, and thereby conducted around the moulds or dies which come in contact with the compound. Pressure of some sort is doubtless necessary in order that the compound may be forced into all parts of the mould or die, and that the material or manufacture may be made smooth and uniform. Objection is made that the word "blisters" is not used in the original patent; but the objection is without merit, as the process and the purpose are plainly suggested and easily understood. Steam-jackets are not named in the original patent; but the language employed is scarcely less suggestive, and fully justifies the action of the commissioner, in granting the reissued patent. Mention should be made that the patentee describes the respective ingredients to be used in preparing rubber in its natural state, as well as for conducting the process of revulcanization, or for working it over a second time; but it is unnecessary to dwell upon that topic, as the patentee states, in express terms, that he does not claim any peculiar compound, or any particular arrangement of machinery, as that part of the invention does not consist in a new composition of matter, nor in a new machine, and he must abide by that disclaimer. Appended to that is another statement which deserves a passing notice, as the representation, if embodied in a claim, would render the claim void, unless it could be limited to such compounds as those described in the specification. He states that the process is applicable to all compounds by means of suitable apparatus; but it is clear that the original patentee never set up any such claim, and if he had, it could not be sustained, as it may be that other compounds, not now known, may yet be discovered, which will prove to be vulcanizable. Goodyear v. Providence Rubber Co. [supra].

Viewed in the light of those explanations, as the specification must be, it is quite clear that the patentee intends to use the compound for vulcanizing rubber, whether old rubber or native rubber, and whether used with or without foreign articles, together with the application of a high degree of heat as the primary means of vulcanization or revulcanization, and that the compound is composed substantially of the same ingredients and in substantially the same proportions as those described in the specification of the great inventor of that improvement.

Beyond question, the inventor in the case before the court intended to use substantially the same ingredients as the primary means of vulcanization or revulcanization; but he admits that those means are public property, and he does not profess to describe anything of the kind as a part of his invention. Subject to these explanations and qualifications, he proceeds to say that the first part of his invention relates to moulding the compound used, and consists in the use of a mould which is heated by steam before the compound is placed in it, or before the pressure is applied for moulding it, the other portion of the mould or die being also heated by steam and brought into its place with force sufficient to cause the compound, which is softened by the heat, to completely fill the mould, and he states that that part of the invention is especially useful when a compound is used which contains a portion of old vulcanized rubber. Immediately following, and without any intervening explanation, is the equally explicit statement as to the second part of the invention, which the patentee says relates to the application of the heat necessary for curing the compound, and "consists in applying it by means of steam in steam-chambers or steam-jackets, the heat of the steam being conducted by the walls of the steam-chamber or steam-jacket which comes in contact with it." Carefully examined, it will be seen that the second claim of the patentee is for the mode described in applying heat by means of steam in steam-chambers or steam-jackets,

and also the mode of conducting it to the compound by the walls of the steam-chamber or steam-jacket. He does not claim to be the discoverer that heat will cure the compound, nor even the ingredients of the compound, as those matters were discovered by an antecedent inventor. External pressure is generally necessary to some extent, and the third part of the invention, as the patentee states, consists in applying the necessary heat to the compound while under pressure, either external or such as is produced by the expansion of the compound when confined in the moulds.

These claims are repeated at the close of the specification; but it is unnecessary to give give them much separate examination, except to say that they must receive the same construction as that given to the claims mentioned in the body of the specification. Suppose that it is so, still the respondents insist that the art of placing such compound or compounds in moulds or between metallic surfaces or dies, and then applying heat and moulding the same into the desired form either in large chambers or ovens, filled with steam of the proper temperature, was well known and used before the invention was made by the original patentee in this case. They also allege in their answer, that the art of smoothing the surfaces of goods by means of steam contained within the walls or chambers formed in rollers or dies, was also known and used before the date of that invention. Remarks respecting the invention of Charles Goodyear are unnecessary, as it has already been shown that the letters-patent in this case, when properly construed, do not describe the invention of the patentee as embracing anything which was patented to the former inventor. Brief reference only need be made to the patent of Thomas Hancock, as it is evident that the invention differs widely from that of the complainants in the case before the court. His moulds were different, as he employed the steam-boiler process, and not the mould surrounded by steam-chambers, as described in the complainant's patent. He formed the article in the mould before he applied heat, and in inner surface of the mould, or to the article order to prevent the compound from adhering to the mould, he employed silicate of magnesia, and applied the same either to the as formed of the compound, and in many cases he removed the article from the mould before it was vulcanized. None of the mechanism employed by the original patentee in this case is described in the specification of the Hancock patent. All that need be said respecting the patent of Samuel Lord and that of John Smith is, that the patent granted to the former was for an improvement in pressing whole pieces of woolen cloth, and that of the latter was for the construction of moulds heated by steam or otherwise for shaping the brims of hats, and that they are not of a character, in the opin-

ion of the court, to supersede the invention secured in the reissued letters-patent of the complainants. Such part of the invention of the complainants described in the letters-patent as consists in the means of constructing the mould, or of modifying the pressure, upon the material while the heat is being applied for the purpose of vulcanization, is substantially admitted to be new and useful within the meaning of the patent law, and the court is of the opinion that each of the three claims, if properly construed and limited as herein described, is valid.

Discussion of the objection taken in argument that the alleged improvement, as described in the specification, is not patentable, may well be omitted, as the remarks of the court already made in defining the invention show that the defence cannot be sustained.

Grant that the construction of the patent adopted by the court is correct, and it follows that the charge of infringement to a certain extent is admitted; and the correct practice where infringement to any extent is admitted, if the patent is held to be valid, is to enter an interlocutory decree for the complainant, and send the cause to a master to ascertain the amount which the complainant is entitled to recover. Such gains and profits only as were made by the respondent in the unlawful use of the invention could be recovered by the complainant in an equity suit, prosecuted under the repealed patent act, as appears by several decisions. Livingston v. Woodworth, 15 How. [56 U. S.] 558; Providence Rubber Co. v. Goodyear, 9 Wall. [76 U. S.] 804. Different rules, however, are enacted in the new patent act, which provides that the complainant, when a decree is rendered in a suit in equity for an infringement, shall be entitled to recover, in addition to the profits to be accounted for by the respondent, the damages he has sustained thereby, and the further provision is, that the court shall assess the same or cause the same to be assessed in its discretion, and that the court shall have the same discretionary power to increase the damages as that given by the act where the damages are found by a verdict in an action on the case. 16 Stat. 206.

Profits are to be accounted for by the respondent in every such suit, whenever a decretal order to that effect is rendered against the respondent for an infringement, and if it appears that the injuries which the complainant sustained by the infringement are greater than the gains and profits realized by the respondent in making and using the invention, and vending it to others to be used as estimated and assessed, then the complainant is entitled to recover compensation for the excess of the injuries sustained, beyond the amount estimated and assessed for the gains and profits received by the respondent. Actual damages for the injuries sustained by the complainant beyond

the amount estimated and allowed for the gains and profits made by the respondent, must be assessed in the first instance; but the court in its discretion may increase the amount so allowed to any sum according to the circumstances, not exceeding three times the amount estimated and assessed as the actual damages sustained beyond the gains and profits realized by the respondent. Prior acts and parts of acts set forth in the schedule of acts annexed to the last section of the new act are declared by the first clause of that section to be repealed; but the next clause of the same section provides that the repeal enacted shall not affect, impair, or take away any right existing under any of said laws. Pending actions are in terms saved from all the consequences of the repeal; and the further provision is that all actions and causes of action, both in law and in equity, which have arisen under any of said laws "may be commenced and prosecuted to final judgment and execution in the same manner as though this act had not been passed," excepting that the remedial provisions of the act shall be applicable to such causes of action if commenced and prosecuted subsequent to the passage of the new act. 16 Stat. 216. Damages for the infringement of letters-patent, where the wrongful acts were committed by the respondent subsequent to the passage of that act may, in certain cases, be recovered by the complainant in an equity suit, beyond the gains and profits made by the wrong-doer; but it is clear that the case before the court is not of that character, as fully appears by the allegations of the bill of complaint.

Decree for complainants, to be framed in conformity to the opinion of the court.

[NOTE. In respect to the proposition that reissued letters-patent must be for the same invention, and that, where it appears, on a comparison of the two instruments, as matter of law, that the reissued patent is not for the same invention as that secured by the original patent, the reissued patent is invalid, see Knight v. Baltimore & O. R. Co., Case No. 7,882; Matthews v. Boston Machine Co., 105 U. S. 54; Putnam v. Yerrington, Case No. 11,486; Hammond v. Franklin, 22 Fed. 833; Brown v. Selby, Case No. 2,030; Heald v. Rice, 104 U. S. 737; Swain Turbine Manuf'g Co. v. Ladd, 102 U. S. 408; Giant Powder Co. v. California Powder Works, 98 U. S. 126; Sickles v. Evans, Case No. 12,839; Stephens v. Pritchard, Id. 13,407; Batten v. Taggert, Id. 1,107; Campbell v. James, Id. 2,361; Cammeyer v. Newton, Id. 2,344; Goodyear v. Berry, Id. 5,556; Corn-Planter Patent, 23 Wall. (90 U. S.) 181; Tarr v. Webb, Case No. 13,757; Meyer v. Maxheimer, 9 Fed. 99; Gill v. Wells, 22 Wall. (89 U. S.) 1; Wood Paper Patent, 23 Wall. (90 U. S.) 566; Driven-Well Cases, 16 Fed. 387; Ball v. Langles, 102 U. S. 128; Vogler v. Semple, Case No. 16,989; Rayer & L. S. M. Co. v. American Printing Co., 19 Fed. 428; Russell v. Dodge, 93 U. S. 460; Hopkins & D. Manuf'g Co. v. Corbin, 103 U. S. 786; Averill Chemical Paint Co. v. National Mixed Paint Co., 9 Fed. 462; Dunbar v. White, 15 Fed. 747. See, also, McCrary v. Pennsylvania Canal Co., 5 Fed. 367; Sharp v. Tifft, 2 Fed. 697.]