**HAZELTINE RESEARCH, Inc.,**
**Plaintiff,**

**v.**

**AVCO MANUFACTURING CORPORA-**
**TION and The Harry Alter Co.,**
**Inc., Defendants.**

**No. 51 C 1640.**

United States District Court
N. D. Illinois, E. D.
June 29, 1954.

Laurence B. Dodds and Joseph R. McPhee, Jr., Little Neck, N. Y., M. Hudson Rathburn, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., Philip F. LaFollette, Madison, Wis., for plaintiff.

Floyd H. Crews, Morris Belson, Darby & Darby, New York City, Alden D. Redfield, Charles M. Hogan, and Norman J. O'Malley, Cincinnati, Ohio, Frank J. Naphin, Warren G. Sullivan, Pruitt & Grealis, Chicago, Ill., for defendants.

KNOCH, District Judge.

This is a patent infringement suit based ·upon letters patent Re. 22,055. The defenses are invalidity of the patent and non-infringement.

The case came on for hearing before the court on the pleadings and the evidence, consisting of oral testimony and documentary proofs. Witnesses were called by the respective parties, whose testimony was transcribed in the record. The court has had the benefit of argument by counsel, both orally and upon briefs.

The court has reviewed the record and briefs of counsel and weighed carefully the arguments presented and considered the authorities advanced by respective counsel in support of their respective claims.

Upon a consideration of the whole case, the court makes the following:

### Findings of Fact

1. This is a suit for infringement of claims 5, 6, 7, 9, 10 and 13 of Patent Re. 22,055—Toulon, assigned to plaintiff Hazeltine Research, Inc., a company engaged in research and development in the radio and television field, against Avco Manufacturing Corporation, a manufacturer of radio and television receivers, and The Harry Alter Co., Inc., its distributor for the Chicago area. The patent in suit is directed to a portion of a broadcast television receiver circuit.

2. Among the problems encountered in the broadcasting and reception of television signals is a most important one which involves maintaining the analysis of the image at the transmitter and the synthesis at the receiver in synchronism, that is, in step or in gear. In commercial electronic television broadcasting, the analysis of the image at the transmitter and the correlative synthesis at the receiver are effected by cathoda-ray tubes. Such a tube develops an extremely fine pencil or beam of electrons, known

as a cathode ray, which is deflected back and forth and up and down across the face of the tube, a process called "scanning". The scanning at the transmitter and at the receiver must be maintained in synchronism so that, at every instant, the cathode ray of the picture tube at the receiver is reconstructing the same portion of the transmitted image as is being analyzed by the camera tube at the transmitter. This synchronism is effected by sending out at the end of each scanning line a synchronizing pulse and at the end of each series of lines, constituting one complete image, termed a field, a different type of synchronizing pulse. These pulses are added to the picture signals at the transmitter and must be separated again at the receiver. For convenience, the term "synchronizing signal" is abbreviated as "sync signal". Such separated sync signals are utilized to synchronize relaxation oscillators in the receiver which develop saw-tooth waves for effecting horizontal and vertical scanning of the receiver picture tube. Prior to Toulon's invention, the separated sync pulses were employed to "trigger" each cycle of the line-scanning and field-scanning generators so as accurately to time the initiation of each line and each field, respectively. This type of synchronizing system had the advantage that, under favorable signal conditions, it provided very accurate synchronization. However, Toulon first discovered that it had the disadvantage that, under conditions of noise interference strong relative to the sync signal, synchronization became erratic and unstable. This disadvantage of the triggered synchronizing system was not recognized by other workers in the art at the time Toulon made his invention. At that time, the triggered synchronizing system was considered completely satisfactory and laudatory statements about it were published by the famous television pioneer, Vladimer K. Zworykin. (Proceedings of the Institute of Radio Engineers, December, 1933.)

3. Toulon, a noted French inventor, made the invention of the patent in suit in France, in 1936. The Toulon invention comprises a basically new type of synchronizing system for electronic television receivers. It involves four essential factors: (1) a recognition of the problem, that is, the inadequacy of the triggered synchronizing system under unfavorable noise conditions; (2) a recognition of the fact that one of the known "building blocks" of the electronics art, the phase comparator, had the characteristic of substantial immunity to noise pulses of the same character as the short-duration synchronizing pulses; (3) a modification of the known phase comparator building block, enabling it to work with the particular wave forms found in electronic television receivers; and (4) association with this special phase comparator of a number of other building blocks, individually known but specially selected, to construct a new synchronizing system operating on essentially new principles and achieving essentially new results.

4. The Toulon invention is sufficiently described in Patent Re. 22,055 in suit, the underlying principles of operation of the invention being described in the paragraph beginning at page 2, column 1, line 33; the description of a specific embodiment of the invention as represented in Figure 3 of the drawings being found in the paragraph beginning at page 2, column 2, line 14; and the operation of such specific embodiment of the invention under normal operating conditions being described in the paragraph beginning at page 2, column 2, line 73.

5. Toulon filed an original patent application, completely disclosing his invention, in France on July 8, 1936, this application maturing into French Patent No. 820,138. On July 3, 1937, he filed in the United States Patent Office an application Serial No. 151,807 corresponding to his French application, in accordance with the provisions of that section of the Patent Statutes (35 U.S.C. § 119; 35 U.S.C. § 32, 1946 ed.) implementing the adherence of the United States to the International Convention for the Protection of Industrial Property. The latter

application also contained a complete disclosure of the invention illustrated and described in the aforesaid French application and matured into U. S. Patent 2,227,815, dated January 7, 1941.

6. After the issuance of aforesaid original Patent 2,227,815 it was called to Toulon's attention that in several respects the patent was "through error and without any deceptive intention, deemed * * * partly inoperative * * * by reason of a defective specification" and "by reason of the patentee claiming * * * less than he had a right to claim in the patent". Therefore, he authorized the filing of an application under 35 U.S.C. § 251 (35 U.S.C. § 64, 1946 ed.) to reissue his original Patent 2,227,815 to correct such defects, and such application was duly filed under Serial No. 390,212 and duly issued March 24, 1942 as Patent Re. 22,055, in suit.

7. Simultaneously with his execution of the reissue application papers as aforesaid, Toulon assigned his original Patent 2,227,815 to Hazeltine Corporation, plaintiff's predecessor in title, which had previously entered into a contingent purchase contract with Langley, Toulon's agent in the United States.

8. In brief, what Toulon disclosed in his original Patent 2,227,815 as his invention and sought to patent and what is described and claimed in his Patent Re. 22,055, comprises the following essential features:

(a)—a system for precisely controlling the synchronization of an electronic television receiver from a series of received synchronizing pulses of short duration relative to their period,

(b)—for substantially eliminating the deleterious effects of noise pulses similar in nature to the synchronizing pulses and the effects of momentary synchronizing signal interruption, comprising,

(c)—a circuit for supplying the periodic synchronizing-signal pulses to the system,

(d)—a relaxation oscillator which in the absence of control has substantially

the same average frequency as these synchronizing signal pulses,

(e)—a phase-comparison circuit for deriving a periodic wave dependent in wave form upon the phase difference between the synchronizing signal pulses and the output wave of the oscillator,

(f)—a rectifier for developing from this derived periodic wave a unidirectional frequency-correcting control voltage,

(g)—specifically in association with a circuit of long time constant relative to the period of the signal pulses,

(h)—a circuit for utilizing this unidirectional control voltage to control the instantaneous frequency, and thus the phase, of the relaxation oscillator,

(i)—and a circuit for developing from the output of the relaxation oscillator a saw-tooth wave for scanning.

9. Since 1947 the Toulon invention, as described, has gone into widespread commercial use and at the present time is embodied in substantially all commercial television receivers. With the exception of Defendant Avco Mfg. Corp., all major manufacturers of television receivers, accounting for more than ninety per cent of current commercial production, have recognized the patent in suit by operating under license from plaintiff with respect to such patent, as well as others of plaintiff's patents. Plaintiff previously brought an infringement action in this Court on this same Toulon patent against a wholly owned subsidiary of Philco Corporation, one of the largest producers of television receivers in the country. Shortly before the date set for trial of the Philco case, Philco Corporation took a license under the Toulon Patent Re. 22,055 in suit, as well as plaintiff's other patents, and the action was discontinued. One of the factors contributing substantially to the general adoption of the Toulon synchronizing system was a series of Technical Reports and Engineering Memoranda, containing detailed design information on the Toulon type of synchronizing system, distributed by Hazeltine to its licensee—manufacturers short-

ly after World War II and just as the television industry was being reactivated.

10. The original Toulon Patent 2,227,815 and the patent in suit, Re. 22,055, are not indefinite or incomplete because of the fact that they do not specify the values of various circuit elements, since such values, per se, were not a part of the invention; they were not critical; they were well within the skill of competent radio engineers at the time the Toulon invention was made; and since it is not customary to specify values of circuit elements in the specifications of patents dealing with inventions of a system character, as contrasted to those dealing with particular elements or components of a system.

11. Defendants at the trial relied upon four United States patents to establish invalidity of the claims of the patent in suit. Plaintiff offered one additional United States patent which was considered by the Patent Office during the prosecution of the patent in suit and which was more pertinent to the Toulon invention than those advanced by Defendants which were not considered by the Patent Office, or was equivalent thereto. These patents fail to anticipate the Toulon invention for the following reasons:

(a) Patent 1,963,246 — Purington. This patent describes a synchronizing system for a mechanical facsimile receiver in which incoming synchronizing waves (presumably of sine wave form) and the output of a generator in the receiver are compared to develop a control bias voltage which is utilized to control the energization, and thus the speed, of the receiver motor driving the facsimile machine and also driving the generator.

The synchronizing system of the Purington receiver is of a radically different nature from that of the Toulon invention and it lacks nearly all of the essential features of the Toulon synchronizing system. Understandably, the Purington patent was not cited by the Patent Office in the consideration of the Toulon patent applications, for it is less relevant to the Toulon invention than Patent 2,066,528 —Harper, which was cited and considered by the Patent Office.

(b) Patent 1,976,877—de Bellescize. There is disclosed in this patent a system for synchronizing a local oscillator of a special type of receiver known as a "homodyne" with respect to the incoming signal oscillations. The local and incoming oscillations are compared in a phase detector which develops a control bias voltage which is applied to the local oscillator to regulate its frequency.

The de Bellescize patent was not cited by the Patent Office in the proceedings on the Toulon patents, but its disclosure is equivalent to that of Patent 2,066,528—Harper, which was cited and considered by the Patent Office.

The synchronizing system of the de Bellescize patent is of a type quite different from that of the Toulon invention. It is not directed to a television system at all and it lacks nearly all of the essential features of the Toulon synchronizing system.

(c) Patent 2,132,654—Smith. This patent relates to a rather elaborate system for synchronizing the line-scanning and field-scanning generators of a film-scanning television transmitter with respect to the ordinary commercial 60-cycle power supply. In this system there is a 20,580-cycle local oscillator of the multivibrator type. From this oscillator there is derived, by way of a chain of frequency dividers, a 60-cycle saw-tooth wave which is compared with the 60-cycle sine wave from the power supply to derive a control bias voltage which is utilized to regulate the frequency of the 20,580-cycle oscillator.

The Smith patent was cited and fully considered by the Patent Office in the prosecution of the Toulon reissue patent application and was found not to be an anticipation of the Toulon patent claims in suit. The Smith system differs from the Toulon invention in many important respects related to the fact that it is comprised in a transmitter and not a receiver. It lacks the majority of the es-

sential features of the Toulon synchronizing system.

(d) Patent 2,137,010—Bedford. This patent is directed to a system generally similar to that of Smith Patent 2,132,654, but differing in detail. In this patent the local oscillator is a 10,800-cycle multivibrator from which is derived through a frequency dividing chain a 12-cycle impulse wave. Another 12-cycle impulse wave is derived from the 60-cycle power source. The local oscillator is then locked with the 60-cycle power source by a comparison of the two 12-cycle impulse waves, from which is derived a control bias potential which is applied to the 10,800-cycle oscillator to control its frequency.

The Bedford patent was before the Patent Office during the prosecution of the Toulon reissue application resulting in the patent in suit, but was found not to be an anticipation.

The defendants' expert, Mr. Kelley, considered the Bedford patent to have the disclosure closest to that of the Toulon patent in suit of any of the reference patents relied on by defendants.

Nevertheless, there are a number of essential and basic distinctions between the Bedford disclosure and the Toulon invention:

(1) The Bedford circuit does not relate to a television receiver as does Toulon, but to a transmitter, which has a quite different principle of operation and presents quite different synchronizing problems;

(2) The synchronizing wave is transmitted on a channel separate from the picture signals, an arrangement which would render it unsuitable for synchronizing an electronic television receiver;

(3) The synchronizing wave is transmitted by wire rather than by radio, so that it is inherently relatively immune to disturbance by noise interference; and

(4) The synchronizing wave and the wave from the local oscillator differ greatly in frequency, a fact which substantially complicates the phase-comparison arrangement

Furthermore, the following essential features of the Toulon invention are lacking from the Bedford disclosure:

(1) A system for precisely controlling the synchronization of an electronic television receiver from a series of received synchronizing pulses of short duration relative to their period.

(2) Means for substantially eliminating the effect of noise pulses similar in nature to the synchronizing pulses of short duration and the effect of momentary synchronizing signal interruptions.

(3) A circuit for supplying periodic synchronizing pulses of short duration to the system.

(4) A relaxation oscillator which, in the absence of control, has substantially the same average frequency as the incoming synchronizing wave.

(5) A circuit for developing from the output of a controlled relaxation oscillator a saw-tooth wave for scanning.

While Mr. Kelley, defendants' expert, considered the Bedford disclosure the closest to the Toulon invention of any of the reference patents relied on by defendants, Mr. Kelley admitted, in agreement with plaintiff's expert, that essential features (1) and (2), supra, are not disclosed in the Bedford patent.

The foregoing patents relied upon by defendants fail to teach or suggest the Toulon invention. Furthermore, none of them contains any disclosure that would be of use to an engineer designing an electronic television receiver.

12. The Toulon synchronizing system for electronic television receivers represents a basic and fundamental advance in the television art. It does not represent a mere improvement or modification of prior television synchronizing circuits which would have been obvious to a person having ordinary skill in the television art at the time the invention was made.

13. Defendants have manufactured and sold within the Northern District of Illinois television receivers identified as Model 11–445 MU.

14. Defendants' Model 11–445 MU television receivers include a synchronizing circuit which, in all material respects, is essentially the same as that described and claimed in the Toulon patent in suit and which operates on the same principles and produces the same results as that described in the Toulon patent in suit.

15. Such differences as exist between the synchronizing Circuit of defendants' Model 11–445 MU television receivers and that of the Toulon patent in suit represent minor improvements and refinements which have been developed in the television art since Toulon made his invention in 1936; such differences do not represent any departure from the essential features of the synchronizing system disclosed and claimed in the Toulon patent in suit.

16. Defendants contend that they escapse infringement because their synchronizing system provides a large control potential for the scanning oscillator during normal operation of the synchronizing ssytem, while the Toulon synchronizing system operates with a small control voltage during normal operation, but this defense fails in that it arises from an erroneous interpretation of the disclosure of the Toulon patent.

17. Each of claims 5, 6, 7, 9, 10 and 13 of Toulon Patent Re. 22,055 reads in terms, element by element, on the synchronizing circuit of defendants' Model 11–445 MU television receivers.

18. Defendants allege that plaintiff should be denied recovery because the delayed payment of the final Patent Office fee in original Patent 2,-227,815 was tainted with fraud, but in fact the record fails to establish that there was any fraudulent representation or misrepresentation of any material fact to the Patent Office or concealment of any material fact from the Patent Office in connection with such delayed payment of the final fee.

19. Defendants allege that plaintiff should be denied recovery because the filing of the application for reissue of original Toulon Patent 2,227,815, which application resulted in the patent in suit, was tainted with fraud, but in fact the record fails to establish that there was any fraudulent representation or misrepresentation of any material fact to the Patent Office or concealment of any material fact from the Patent Office in connection with the filing of such reissue application or its prosecution.

In connection with defendants' accusation of fraud in the filing of the reissue application, Deposition was taken of the inventor Toulon, who was accused of making a false oath in support of the reissue application. However, defendants failed to offer Toulon's Deposition in evidence.

20. Defendants allege that the Toulon patent in suit is invalid because it describes and claims an invention different from that of original Patent 2,227,815, but in fact the changes made by the reissue application were only by way of clarification, alternative expression, amplification, expression of a more general aspect of the invention, or correction of unclear or erroneous language and they do not involve any new idea or disclosure.

21. Defendants allege that the Toulon patent claims in suit are not infringed by the accused television receivers because of estoppel arising against plaintiff from proceedings on the Toulon original and reissue applications in the Patent Office, but the official Patent Office records of those proceedings show that no positions were taken, or representations made, by Toulon or his representatives which in any way were inconsistent with plaintiff's present position on infringement.

22. Defendants urge that plaintiff should be denied recovery because of alleged misuse of its patents arising from plaintiff's refusal to grant to defendant, Avco Manufacturing Corporation, and to others licenses under less than all of its large group of patents, but there is no evidence of record to support such allegation of defendants.

23. Defendants urge that plaintiff should be denied recovery because of

alleged misuse of its patents arising from an alleged conspiracy between plaintiff and one Harold M. Lewis arising out of an Agreement between them dated April 12, 1951, jointly to exploit a certain Patent 2,208,374, of which said Lewis was the inventor, but the record does not support allegations that that Agreement was not a bona fide business venture from which both parties hoped to reap a benefit; that such Agreement or the activities of plaintiff and Lewis thereunder prejudiced defendants or others in the television industry; that such activities represented any effort by plaintiff or Lewis to misuse their respective patents; or that such activities resulted in any misuse thereof.

24. Defendants have admitted that they have "reported the situation to the Attorney General" with respect to plaintiff's alleged unclean hands, but that Government official, charged with protecting the public interest, has not seen fit to take any action.

### Conclusions of Law

1. This is an action arising under the laws of the United States and this Court has jurisdiction of the subject matter and the parties involved. (28 U.S.C. § 1338).

2. Plaintiff Hazeltine Research, Inc., is the owner of the entire legal and equitable title and interest in and to Toulon Patent Re. 22,055, in suit.

3. Toulon original Patent 2,227,815 was duly and legally issued pursuant to the patent laws of the United States and complies with the statutory provisions.

4. Toulon Patent Re. 22,055 is a duly and legally issued reissue of original Patent 2,227,815 pursuant to the patent laws of the United States and complies with the statutory provisions.

5. The usual presumption of validity arising from the granting of the patent in suit is strengthened in this case by the fact that patents representative of the closest prior art were considered by the Patent Office in the examination of the application on which the Toulon patent in suit issued. Williams Man-

ufacturing Company v. United Shoe Machinery Corporation, 6 Cir., 1941; 121 F.2d 273, affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537; W. A. Sheaffer Pen Co. v. Worth Featherweight Pen Co., 2 Cir., 1930, 41 F.2d 820, 822; Gotham Silk Hosiery Company, Inc., v. Artcraft Silk Hosiery Mills, Inc., D.C.Del.1932, 1 F.Supp. 643, 644; Saklad v. Hurley Shoe Company, D.C.Mass.1933, 3 F.Supp. 904, 906; Modern Products Supply Co. v. Drachenberg, 6 Cir., 1945, 152 F.2d 203; certiorari denied, 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030; Braswell v. Joseph Shaw Co., D.C.N.D.Ohio 1948, 78 F.Supp. 363; Babson Bros. Co. v. Perfection Mfg. Corp., D.C.D.Minn.1949, 86 F. Supp. 754, 759; Oliver United Filters Inc., v. Silver, D.C.Colo. 1952, 103 F. Supp. 935, 939.

6. The presumption of validity in this case is further strengthened by the wide-spread commercial adoption of the Toulon synchronizing circuit by the television industry under license from plaintiff. Goodyear Tire and Rubber Co. Inc., v. Ray-O-Vac, 1944, 321 U.S. 275, 278, 64 S.Ct. 593, 88 L.Ed. 721; Wahl Clipper Corporation v. Andis Clipper Co., 7 Cir., 1933, 66 F.2d 162, 165; Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Trico Products Corporation v. Apco-Mossberg Corporation, 1 Cir., 1930, 45 F. 2d 594, 598; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 1949, 178 F.2d 794, 801; Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550, 555.

7. The Toulon Patent Re. 22,-055 in suit is good and valid in law as to each of claims 5, 6, 7, 9, 10 and 13 thereof; the subject matter of each of such claims is of an inventive and patentable character and is not anticipated by the prior art.

8. In view of the fact that defendants' Model 11–445 MU television receivers include a synchronizing circuit which is essentially the same as that described in Toulon Patent Re. 22,055 and claimed in claims 5, 6, 7, 9, 10 and 13 thereof, and which operates on the same

principles and produces the same results as that described and claimed in Toulon Patent Re. 22,055, each of such television receivers is an infringement of the Toulon Patent in suit. Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 41, 42, 50 S.Ct. 9, 74 L.Ed. 147; Hook v. Hook & Ackerman, Inc., D.C.Pa.1952, 106 F.Supp. 798, 803; Van Der Horst Corp. v. Chromium Corp., D.C.N.Y.1951, 98 F. Supp. 412, 416; Oliver United Filters v. Silver, 10 Cir., 1953, 206 F.2d 658, 666; Graver Tank and Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097.

9. Each of claims 5, 6, 7, 9, 10 and 13 of Toulon Patent Re. 22,055 is infringed by the Model 11–445 MU television receivers manufactured and sold by defendants.

10. It is not open to defendants, here charged with infringement of the patent in suit, to escape the consequences of such infringement by collaterally attacking the patent in suit on the ground of alleged fraud in its procurement. Rubber Co. v. Goodyear, 1869, 9 Wall. 788, 76 U.S. 788, 19 L.Ed. 566; Philadelphia, W. & B. R. Co. v. Dubois, 1870, 12 Wall. 47, 79 U.S. 47, 20 L.Ed. 265; United States v. American Bell Telephone Company, 1888, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450; Carson Investment Co. v. Anaconda Copper Mining Co., 9 Cir., 1928, 26 F.2d 651, 661; Steinfur Patents Corp. v. J. Meyerson, Inc., 2 Cir., 1931, 56 F.2d 372, 381; United Mfg. & Service v. Holwin, D.C.Ill.1952, 13 F.R.D. 510.

11. The invention described and claimed in Toulon Patent Re. 22,055 is the same as that disclosed in Toulon original Patent 2,227,815 as his invention sought to be patented and there was no abandonment of that invention.

12. Plaintiff is not estopped by reason of any of the proceedings in the Patent Office on either the original Toulon Patent 2,227,815 or the Patent Re. 22,055 from asserting infringement of the Toulon patent claims in suit by defendants' Model 11–445 MU television receivers.

13. Plaintiff does not come into Court with unclean hands as alleged by defendants and is not barred from relief thereby.

14. Plaintiff is entitled to a permanent injunction against further infringement by defendants or either of them and all those controlled by them or either of them and in privity with them or either of them.

15. Plaintiff is entitled to an accounting for damages suffered by it by virtue of aforesaid infringement of defendants.

16. Plaintiff is entitled to its costs and disbursements in this Action.